1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   SAMUEL BOYKIN,                          No. 2:19-cv-00137-TLN-DB

12                 Plaintiff,

13        v.                                 **ORDER**

14   UNUM LIFE INSURANCE COMPANY
     OF AMERICA,
15
                   Defendant.
16

17

18         Plaintiff Samuel Boykin ("Plaintiff") was a former Maintenance Specialist for Valero

19   Services, Inc. ("Valero") who suffered a lumbar fracture as a result of a motor vehicle accident

20   ("MVA") in February 2014.  In November 2016, Plaintiff applied for long-term disability

21   ("LTD") benefits through his employer's insurer, Unum Life Insurance Company of America

22   ("Unum").  In June 2017, Unum denied Plaintiff's claim.  Plaintiff subsequently appealed

23   Unum's determination in December 2017, and Unum upheld its decision in April 2018.  Plaintiff

24   brought this action against Unum pursuant to the Employment Retirement Income Security Act

25   ("ERISA").  This matter is before the Court on the parties' Cross-Motions for Judgment under

26   Federal Rule of Civil Procedure ("Rule") 52.  (ECF Nos. 28, 29.)  Both motions are fully briefed.

27   (ECF Nos. 31, 32, 34, 35.)  The Court has carefully considered the parties' arguments and hereby

28   finds, for the reasons set forth below, that Plaintiff is disabled from working in his regular

occupation as defined in the applicable policy.  Accordingly, Plaintiff's Motion for Judgment is GRANTED and Unum's Motion for Judgment is DENIED.

**I.    FINDINGS OF FACT**[1]

     A.    The Relevant Terms and Conditions of the Policy

1.    Unum issued a group long term disability policy number 564565 001 (the "Policy") to Valero with an effective date of January 1, 2001.  (POL 2[2].)  LTD benefits under the Policy are payable after an insured individual completes a 180-day Elimination Period, defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits . . . ."  (*Id.* at 7, 37.)  The Policy provides in relevant part as follows:

> ***HOW DOES UNUM DEFINE DISABILITY?***
>
> You are disabled when Unum determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(*Id.* at 19 (emphasis in original).)  The Policy also defines the terms below as follows.

> **LIMITED** means what you cannot or are unable to do.
>
> . . . .
>
> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that:
>
> - are normally required for the performance of your regular occupation; and

---

[1]    The following findings of fact are taken mostly verbatim from Plaintiff's and Unum's motions for judgment.  (ECF Nos. 28, 29.)  The facts are undisputed except where noted by the Court.

[2]    Unum lodged the administrative record with the Court on January 27, 2020, documents are bates-stamped UA-POL-LTD-000001 through UA-POL-LTD-000051 and UA-CL-LTD-000001 through UA-CL-LTD-002311.  (ECF No. 24.)  References to the Policy will be designated "POL" and references to the administrative record will be designated "AR."

- cannot be reasonably omitted or modified.

. . . .

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(*Id.* at 37–40 (emphasis in original).)

B.   Plaintiff's Accident

1.   On February 23, 2014, Plaintiff was involved in a MVA and injured.  An initial x-ray on March 31, 2014 showed a spinal fracture, specifically an "anterior wedge compression fracture at L1[3] with approximately 50% height loss."  (AR 639.)  A subsequent x-ray of the sacroiliac[4] joint showed a "left L5 transverse process and indistinct cortical margins."  (*Id.* at 649.)  The doctor could not "exclude destructive bone lesion."  (*Id.*)  An MRI on June 30, 2014, confirmed the "anterior wedge deformity of the L1 vertebral body" with a chronic fracture.  (*Id.* at 656.)  In addition, "mild narrow edema[5]" with "[a]ssociated retropulsion[6] and effacement of the adjacent anterior thecal" was observed.  (*Id.*)  There was also "degenerative joint disease [] along the spine," "partial sacralization of the right side of L5," and "[s]oft tissue edema."  (*Id.*)

2.   These spinal injuries caused Plaintiff significant lower back pain.  Immediately after the accident, Plaintiff reported pain at 10 on a scale of 1 to 10.  In the next few weeks, the pain was 7 to 9 out of 10.  Over the next few months, it subsided to 4 to 5 out of 10, which is where it persisted.  (*Id.* at 1558.)  The accident also caused Plaintiff a great deal of stress, which

---

[3]      The spine is divided into three sections: the cervical spine, which is the neck area; the thoracic spine, which is the mid-back; and the lumbar spine, which is the lower back.  A fracture at "L1" indicates that the fracture occurred in the uppermost vertebrae of the lumbar spine.

[4]      The connection between the hips and the spine.

[5]      Edema is the abnormal accumulation of fluids.  "Marrow edema" is where the fluid builds up in the bone marrow, usually in response to an injury.

[6]      A retropulsed fragment is where the fracture fragment is displaced into the spinal canal.

3

1  led him to seek aid from a mental health professional.[7]

2      3.      Plaintiff went off work due to his injuries, but returned to work in September

3  2014.  Plaintiff contends his return to work was not due to a remission in his symptoms of severe

4  pain as he still "had back pain the entire time." (*Id.* at 196.)  Rather, "[h]e was able to return to

5  his job, in spite of his pain . . . because he had a supportive supervisor who accommodated his

6  needs" (*id.* at 68) and "other employees would try to help him [with] heavy lifting" (*id.* at 196).

7  Plaintiff asserts two things happened in 2015 to make it difficult for him to continue working.

8  First, his supportive supervisor was replaced by a supervisor who was not sympathetic and was

9  pressing him to go on disability.  (*Id.* at 14.)  Second, in July and August, Plaintiff experienced a

10  significant increased in his symptoms of back pain.

11            C.    <u>Plaintiff's Medical History</u>

12      1.    <u>Primary Physician</u>: On July 22, 2015, Plaintiff consulted with his primary treating

13  physician, Dr. Minerva Saqui, telling her that for the past few weeks he had been experiencing

14  more significant pain in his lower back.  (*Id.* at 1527.)  Dr. Saqui could find no reason for the

15  increased pain from his more recent back scans.  (*Id.*)  She suggested increased doses of

16  Ibuprofen or Aleve.[8]  (*Id.*)  By August 10, 2015, Plaintiff was still reporting that his back pain had

17  gotten worse.  (*Id.* at 1546.)  He later informed Dr. Saqui that the pain was limiting his ability to

18  sit or stand: "I currently can't sit for more than about 2 hours (if I'm reclined), if I'm upright I'm

19  lucky to sit for [about] 30 minutes.  I can't stand for more than [about] 1 hour, unless I'm walking

20  then I'm good for more than [about] 2–3 hours." (*Id.* at 1577.)

21  ///

22

23  [7]     On March 31, 2014, Plaintiff consulted with Kaiser's Yvette Flores, a psychological
resident, complaining of "excessive worry, restlessness, muscle tension and lightheadedness."

24  (*Id.* at 786.)  During a later August 3, 2016 consultation with LCSW Ted Sachs, Plaintiff had
"daily flashback memories" of the accident, nightmares, anxiety, and had "difficulties falling and

25  staying asleep due [to] the pain caused by the [accident], as well as the images/nightmares." (*Id.*

26  at 67.)

27  [8]     Narcotic prescriptions were not an option for Plaintiff, as they were not allowed in his
workplace.  (*Id.* at 1577.)  In addition, his mother had been addicted to prescription drugs and he

28  was worried about the same thing happening to him.  (*Id.* at 1155.)

2.     Spine Specialist: Dr. Saqui referred Plaintiff to a spine specialist, Dr. Peter Boorstein (*id.* at 1551), who on August 19, 2015, reviewed Plaintiff's most recent MRI from August 6, 2015, which showed "moderate severe L1 wedge-shaped fracture with very slight loss of height since prior study with increasing size of the superior endplate Schmorl's node.[9]" (*Id.* at 1554.)  The MRI also showed "stable multilevel degenerative disease with right greater than left neural foraminal narrowing[10] associated with annular fissures." (*Id.*)  According to Dr. Boorstein, Plaintiff had gone "back to work [in] Sept[ember] 2014" and had been "functional with low back pain, 3 to 4 [out of 10], increased transiently when climbing up the ladder." (*Id.*)  However, "for the past 2 weeks," Plaintiff had been experiencing "more low back pain, right sided, 5 to 6, throbbing to sharp, worse after 30 minutes standing, walking, sitting." (*Id.*)  Dr. Boorstein referred Plaintiff for acupuncture (*id.* at 1561) and physical therapy (*id.* at 1559).

3.     Acupuncturist: Plaintiff then met with licensed acupuncturist ("LAC") Michael Clauson on October 22, 2015, for an initial acupuncture treatment. (*Id.* at 1607.)  He had follow up treatments on November 13, 2015 (*id.* at 1614), and another on December 11, 2015 (*id.* at 1621).  During this last visit, LAC Clauson told Plaintiff that his back pain was chronic and that acupuncture would not be effective in relieving it. (*Id.* at 1625.)

4.     Spinal Injections: Plaintiff researched other possibilities for relief and had been told by a coworker that spinal injections from Dr. Glenn Ozoa had been successful in relieving his pain.  Dr. Saqui was able to locate Dr. Ozoa in the Kaiser system and provided Plaintiff with a referral. (*Id.* at 1625.)  On December 23, 2015, Dr. Ozoa examined Plaintiff and reviewed his x-ray and MRI.  According to Dr. Ozoa, beyond the "severe wedge shaped fracture of L1," there were other abnormalities in Plaintiff's spine:

- The disc at L1-2 with a "foraminal disc protrusion" with "foraminal narrowing";
- An "annular fissure" with "right neural foraminal narrowing" in disc L2-3;

---

[9]     The spine is comprised of bony vertebrae, which are separated by discs made of softer cartilage.  Schmorl's node is where the soft tissue of the disc protrudes into the bony tissue of the vertebrae.

[10]     The foramina are opening in the spine to allow nerve roots to exit.  "Foraminal narrowing" is where these openings narrow, potentially impinging on the nerve.

- At L3-4 there was "mild disc bulging" with "foraminal disc protrusion," an "annular fissure," and "moderate right-sided neural foraminal narrowing as well [as] left-sided neural foraminal stenosis"; and

- "Mild disc bulging with facet arthropathy"[11] at L4-5.

(*Id.* at 1634.) Dr. Ozoa concluded that these were all potential contributors to Plaintiff's back pain: "Based on today's clinical evaluation, patient's symptoms are likely multifactorial, with a contribution of left lower face joint arthropathy as well as a myofascial overlay in the postural faults related to the L1 vertebral fracture." (*Id.* at 1635.) Dr. Ozoa recommended injections in the facet joints at L3-4, L4-5, and L5-S1. (*Id.*)

5.       On January 15, 2016, Dr. Ozoa performed spinal injections into Plaintiff's L3-4 and L4-5 facet joints. (*Id.* at 410.) However, Plaintiff reported that the injections were ineffective in relieving his pain: "[U]nfortunately the facet injections never seemed to work.  I gave them a few months to see if something would change, but the pain remains, still fluctuating between a 3–6 (depending on the activity and exercise)." (*Id.* at 434.)

6.       Dr. Ozoa advised Plaintiff that he was not a candidate for bone replacement surgery: "Unfortunately you are not [a] candidate for that due [to] the possibility of bone fragments getting pushed further towards your nerves." (*Id.*)  Instead, Dr. Ozoa suggested that some other area of Plaintiff's spine might be the pain generator and suggested trying injections at other locations." (*Id.* at 433.)

7.       On June 3, 2016, Dr. Ozoa tried another set of injections, this time at L1-2 and L2-3. (*Id.* at 454.) However, on June 13, 2016, Plaintiff reported that he had given "the facet injection a week and a half to see if it would help" and "unfortunately it hasn't so far." (*Id.* at 462.)  He told Dr. Ozoa that he would "keep on trying whatever will work" and asked about other options. (*Id.* at 462–63.)  But Dr. Ozoa had no other options other than acupuncture (*id.*), which Plaintiff had already tried.

///

---

[11]      Facet arthropathy is arthritis attacking the spine's facet joints.

1           D.      Plaintiff's Claim History

2      1.      Plaintiff Submits Claim for Short-Term Disability ("STD") Benefits: On June 21,

3 2016, Plaintiff reached out to Dr. Saqui, noting the lack of viable options to relieve his severe

4 pain and asking if there were anything else he could try: "I'm looking for other solutions and I've

5 asked Dr. Boorstein and Dr. Ozoa, but with my injury I have very limited options.  They said I

6 can't have the Lumbar Vertebral Body Replacement surgery due to my fragmented vertebrae."

7 (*Id.* at 470.)  By June 30, 2016, Plaintiff decided that he had no realistic options for addressing his

8 back pain, writing to Dr. Saqui: "As you know I've been working fulltime since I returned to

9 work 6 months after my accident.  However, I've been in constant daily pain since my accident.

10 After having tried facet injections x2, acupuncture x3, and daily excessive, stretching, nothing to

11 date has relieved my back pain." (*Id.* at 474.)  Plaintiff informed Dr. Saqui that disability was his

12 only option. (*Id.*)

13      2.      Plaintiff met with Dr. Saqui again on July 15, 2016.  She confirmed his primary

14 diagnosis of "L1 burst fracture."  She also confirmed his symptoms of daily "axial back pain,

15 lower back" which was "stabbing" and with intensity varying from 3 to 6.  She reported his pain

16 worse after "sitting for an hour," lifting heavy objects, or bending.  She reported Plaintiff had

17 received physical therapy and was doing his assigned exercises, and that acupuncture had been

18 effective.  She noted that he intended to file a disability claim. (*Id.* at 495.)  Plaintiff ceased

19 working that same day, on July 15, 2016. (*Id.* at 56.)

20      3.      Plaintiff submitted a claim for STD benefits on July 20, 2016.  Plaintiff's claim

21 was supported by a July 15, 2016 note from Dr. Saqui. (*Id.* at 51.)  On July 17, 2016, she filled

22 out an Attending Physician Statement ("APS"), attesting to Plaintiff's disability. (*Id.* at 55.)

23 While Plaintiff's STD claim file is not in the AR, it appears that his STD claim was granted. (*Id.*

24 at 48.)

25      4.      On August 3, 2016, Dr. Saqui prescribed Plaintiff with nortriptyline for his pain

26 (*id.* at 519), but he had to discontinue it after two weeks due to severe headaches (*id.* at 63).  She

27 also recommended he complete a multi-session "essential skills pain management program,"

28 which he did. (*Id.* at 577–91.)  Plaintiff also received extensive treatment for his depression and

anxiety, and on August 31, 2016, Dr. Saqui concurred and prescribed sertraline (brand name is Zoloft).[12]  (*Id.* at 63.)

     5.    <u>Plaintiff Submits a Claim for LTD Benefits</u>: On November 20, 2016, Plaintiff submitted a claim for LTD benefits to Unum, stating that he was unable to work as of July 18, 2016 due to chronic back pain and PTSD stemming from the MVA.  (AR 46–49.)  Plaintiff reported sustaining an L1 vertebral fracture.  (*Id.* at 13.)  The claim defined Plaintiff's disabling condition as "chronic back pain" and "PTSD" as a result of the accident in which the driver of the other vehicle was killed.  (*Id.* at 13, 46.)  When asked to describe the job duties he was unable to perform, Plaintiff listed "climbing, sitting, walking, standing, concentrating, [and] lifting."  (*Id.* at 47.)

     6.    Plaintiff's claim was supported by an APS filled out by Dr. Saqui on November 17, 2016.  She stated that Plaintiff's primary diagnosis was "chronic low back pain" and his secondary diagnosis was "post[-]traumatic stress disorder."  (*Id.* at 52.)  Dr. Saqui limited Plaintiff's sitting tolerance to two hours, his standing to 30 minutes, and his lifting to 30 pounds.  She restricted him from "frequent bending" with "no climbing ladders or tower."  (*Id.* at 53.)  Dr. Saqui also provided Unum with the APS she had previously provided to Valero and a number of records from Kaiser showing treatment Plaintiff had received from her, Dr. Ozoa, and Mr. Sachs.  (*Id.* at 63–83.)

     E.    <u>Plaintiff's Communications with Unum</u>

     1.    During a January 4, 2017 telephone call with Unum, Plaintiff reported returning to work approximately six months after the MVA (i.e., in September 2014), and that he was working full-time without restrictions before going out of work in July 2016 (almost two years later).  Plaintiff also reported that none of his treating providers were providing any restrictions and limitations ("R/Ls") prior to his last day worked in July 2016.  Plaintiff explained his symptoms and why they prevented him from being able to work at his job.  (*Id.* at 196–203.)  He also denied having any cognitive issues.  (*Id.*)

---

[12]    Sertraline, or Zoloft, is used to treat depression and anxiety.

2.     Unum completed a vocational review of Plaintiff's job.  Relying on the Dictionary of Occupational Titles ("DOT"), Unum classified Plaintiff as a Maintenance Electrician.  (*Id.* at 841.)  Unum's consultant described the physical demands of this job as "occasional" (*i.e.*, up to 1/3 of the workday) "exertion" (*i.e.*, lifting) of 50 pounds and "frequent" (*i.e.*, up to 2/3 of the workday) standing and walking.  (*Id.* at 842.)  The Maintenance Electrician is also "occasionally" required to do things like reach, climb, stoop, kneel, crouch, and crawl.  (*Id.*)

3.     On January 10, 2016, Unum requested records from Plaintiff's various physicians.  Unum sought records from "January 1, 2016 to the present."  (*Id.* at 383, 387, 390.)  Shortly thereafter, Unum expanded the time period of its request to February 24, 2014, but it limited the records requested to "diagnostic test reports."  (*Id.* at 624.)  As a result, Unum obtained the various x-rays and MRIs during the pertinent period.  (*Id.* at 639–71.)  However, Unum did not obtain Plaintiff's treatment records immediately after the accident, or those during the period when he attempted his return to work, or those during the summer and fall of 2015 when Plaintiff's pain symptoms intensified and he attempted to find some treatment to alleviate his symptoms.  Unum did not obtain Plaintiff's consultations with Dr. Saqui in July and August of 2017, the referral to Dr. Boorstein, his acupuncture by LAC Clauson, or his December 2015 consultation with Dr. Ozoa.[13]

F.     Unum Reviews Plaintiff's Claim

1.     Unum Obtains Medical Opinions Regarding Plaintiff's Claim: Senior Clinical Consultant Debbie Smith, BSN, RN, MBA, CCM, reviewed the file information and opined that Plaintiff's "[a]ctual exam findings related to pain condition are limited."  Nurse Smith also pointed out that Plaintiff had continued to work following the MVA, and that the duration of the R/Ls prescribed by Dr. Saqui (in her APS) was not "clearly appreciated."  Nurse Smith recommended that onsite physicians review and discuss Plaintiff's records — including his reported medical and behavioral health conditions.  (*Id.* at 843–45.)

///

---

[13]     These treatment records are available because they were provided by Plaintiff's counsel during his appeal from Unum's first denial.  (*Id.* at 1511.)

2. Unum physicians, Dr. Trent Thomas, M.D., Board Certified in Internal Medicine, and Dr. Nicholas Kletti, M.D., Board Certified in Psychiatry, participated in a forum discussing Plaintiff's reported impairing conditions. From a behavioral health perspective, it was noted that while Plaintiff attended a psychotherapy session immediately following his February 2014 MVA, he did not return to see a behavioral health specialist until August 2016. And when he did, Plaintiff reported that he stopped working because of an unsupportive supervisor that forced him to apply for permanent disability. It was also noted that no behavioral health provider was certifying impairment from work, and that Dr. Saqui noted that his behavioral health R/Ls are "none." As a result, it was determined that Plaintiff's file did not support impairing mental illness and there was no conflict with any of Plaintiff's treating providers regarding this assessment. From a physical perspective, it was determined that the records did not clearly support physical R/Ls, and that contact with Dr. Saqui was needed. (*Id.* at 846–47.)

3. <u>Unum's Physician Consultant Engages in Peer Contact with Dr. Saqui</u>: By letter dated March 13, 2017, Dr. Thomas wrote to Dr. Saqui to arrange a time to discuss Plaintiff's "ongoing clinical condition and remaining return to work barriers."[14] Dr. Thomas explained that considering Plaintiff's medical history which included his fracture from his 2014 MVA that had healed, and Plaintiff's return to his full-time, otherwise unrestricted occupational duties from September 2014 through July 2016, it was "unclear what changed around 7/2016 (*i.e.*, other than occupational issues involving a change in supervisor) to now result in ongoing/long-term functional impairment." (*Id.* at 858–61.)

4. In response to Dr. Thomas' letter, while noting that various R/Ls precluding occupational capacity were supported (including that Plaintiff could only lift up to 20 pounds and that he could not stand/walk up to 2/3 of the workday), Dr. Saqui wrote: "Disclaimer: I am not [a] qualified disability medical examiner and did not do [a] physical exam to determine functional capacity." Dr. Saqui again reiterated that Plaintiff should "be examined by [a] qualified disability medical examiner to determine functional capacity for work and duration of R/Ls." (*Id.* at 863–

---

[14] Dr. Thomas attempted to speak with Dr. Saqui to discuss Plaintiff's reported conditions, but he was instructed by Dr. Saqui's office to submit any questions in writing. (*Id.* at 870.)

66.)

5.     Unum Schedules an Independent Medical Examination ("IME") of Plaintiff: Based on Dr. Saqui's recommendation for an independent medical evaluation, Unum arranged for Plaintiff to be examined by an independent physician board certified in physical medicine and rehabilitation.[15]  (*Id.* at 874–76.)  The exam was conducted on May 26, 2017, by Dr. Mark Bernhard, Board Certified in Physical Medicine and Rehabilitation and Qualified Medical Evaluator.[16]  (*Id.* at 1331–47.)

6.     Following his review and examination, Dr. Bernhard opined: "[B]ased on the findings of the review of records, physical examination performed by me, history, and progression in terms of improvement, ability to engage in unrestricted work full-time from late 2014 to July 2016 with a minimal degree of chronic pain, the claimant was stable and improved level from the L1 vertebral body fracture."  (*Id.* at 1337–38.)  Dr. Bernhard also opined that given the findings on exam indicating satisfactory muscle strength, satisfactory range of motion, and stable compression fracture without the need for ongoing treatment or surgery, Plaintiff had the following R/Ls: ability to occasionally lift 50 pounds from floor to waist level; sitting; engaging in keyboard use; reaching upward and downward; climbing (up to 1 hour/day); stoop (cumulatively for one-half hour/day); kneeling, crouching, and crawling; walking up to 5 hours/day (cumulatively with breaks every 40 minutes); and that there were no restrictions in terms of fingering or handling in any activities.  (*Id.* at 1345.)

7.     Additionally, to ensure a thorough assessment with respect to determining Plaintiff's functional capacity specific to the demands of his occupation from the date he ceased

---

[15]     Plaintiff's IME was initially scheduled for April 19, 2017, with Dr. Alan Kimelman, Board Certified in Physical Medicine and Rehabilitation.  (*Id.* at 890–91, 1221–28.)  However, Dr. Kimelman's office cancelled the exam a few days before it was scheduled to occur.  (*Id.* at 1234.)  Dr. Kimelman's office apologized for the inconvenience and shredded copies of Plaintiff's medical records.  (*Id.* at 1264.)

[16]     In January 2019, approximately nine months after Unum rendered its decision on appeal, Plaintiff's current attorney provided documentation of a 2011 disciplinary matter by the Division of Workers' Compensation involving Dr. Bernhard related to medical billing issues which was resolved through a probationary period, corrective action, and repayment of amounts overbilled.

working (*i.e.*, July 18, 2016), Unum followed-up with Dr. Bernhard — providing him with the occupational demands of Plaintiff's occupation,[17] and asked him to comment on whether or not Plaintiff could work full-time from July 18, 2016 onward within the R/Ls outlined in his IME report.  (*Id.* at 1375–76.)  Dr. Bernhard responded "yes," Plaintiff could work full-time within the demands of his occupational duties from July 18, 2016 forward.[18]  (*Id.* at 1384–85.)

> G.      Unum Denies Plaintiff's Claim

1.      On June 23, 2017, Unum informed Plaintiff that it had denied his claim on the grounds that the evidence did not support that Plaintiff was precluded from performing his full-time occupational duties from July 18, 2016 forward.  (*Id.* at 1404–09.)

> H.      Plaintiff Appeals Unum's Decision

1.      On December 20, 2017, Plaintiff appealed Unum's claim decision.  In the appeal letter, counsel argued Plaintiff was unable to work due to his multiple physical and psychiatric conditions resulting in functional and cognitive issues.  (*Id.* at 1457–79.)  Along with the appeal, counsel submitted additional medical records, advocacy letters written by Plaintiff and his wife describing Plaintiff's level of functioning, pain logs, as well as Social Security Administration Function Reports completed by Plaintiff.  (*See id.* at 1488–1920.)

> I.      Unum Reviews Plaintiff's Appeal

1.      Unum Performs Another Vocational Review: Senior Vocational Rehabilitation Consultant Kelly Marsiano, M.Ed., CRC, reviewed Plaintiff's occupational information and

---

[17]      As a part of its review, Unum obtained a Vocational Review of Plaintiff's occupation. The vocational reviewer determined that Plaintiff's occupation as performed in the national economy was most consistent with Maintenance Electrician, a medium occupation.  It was noted that the physical demands of the occupation involved occasional exertion up to 50 pounds, standing, walking, sitting, keyboarding, reaching, reaching up/down, climbing, stooping, kneeling, crouching, and crawling; frequent handling, fingering; and that standing/walking could occur up to 2/3 of the workday.  (*Id.* at 841–42.)

[18]      On June 23, 2017, Unum, as a courtesy, sent Plaintiff and Dr. Saqui a copy of Dr. Bernhard's IME report and addendum for her review and invited her to contact them if she had any questions.  (*Id.* at 1402.)  Dr. Saqui did not respond to or otherwise provide any comments in response to Dr. Bernhard's IME.

concluded that his occupation[19] as performed in the national economy was consistent with maintenance mechanic — a medium strength occupation.[20]  Ms. Marsiano noted that the physical demands of the occupation included: frequent combined standing/walking, handling, fingering; occasional reaching at, above, and below shoulder level; sitting; stooping; kneeling; crouching; crawling; balancing; and keyboard use.  Ms. Marsiano also outlined the cognitive demands of the occupation which included: working under specific instruction; attaining precise set limits, tolerances, and standards; and directing, controlling, or planning activities of others.  (*Id.* at 2032–33.)

        2.    <u>Unum Obtains Medical Reviews</u>: Senior Clinical Consultant Tina Tirabassi, RN, MSN, HIA, CCM, reviewed the file information including all the information submitted on appeal and opined that considering all of Plaintiff's medical conditions, alone and in combination, it is unclear why he would be unable to perform his occupational duties from July 18, 2016, and beyond.  Nurse Tirabassi explained:

> In summary, the claimant has a history of low back pain [status post] L1 fracture due to MVA in 2014.  After several months he returned to work full duty.  Diagnostics on file show a healed fracture that is stable.  He is noted to have multilevel degenerative disc disease without evidence of spinal stenosis or nerve root impingement.  Exams have been normal noting intact and symmetrical reflexes, 5/5 BLE [bilateral lower extremities] strength, intact sensation, negative straight leg raises, ability to heel/toe walk and normal gait.  Lumbar tenderness is intermittently present upon exam over time.  He has not taken prescription pain medication since 3 months post MVA.  He has taken various amounts of Ibuprofen in which he reports little relief.  He was referred to PT in August 2015 without any further [office visit notes] provided. He reports having done a few visits without effectiveness. He has consistently reported walking either 1–2 miles/day or an hour/day. He reports having tried 3 acupuncture

---

[19]    According to the job description Unum obtained from Plaintiff's employer (Valero), the "physical demands" of Plaintiff's occupation include regularly walk, sit, talk, and hear; occasionally lift and/or move up to 50 pounds, stand, use hands to finger, handle, or feel, reach with hands and arms, and occasionally be required to climb or balance, stoop, kneel, crouch, or crawl.  The job description also provides that "[r]easonable accommodations may be made to enable individuals with disabilities to perform the essential functions."  (*Id.* at 44–45.)

[20]    Ms. Marsiano pointed out that this occupation was different from maintenance electrician (identified in the previous vocational review).  She noted that both occupations are in the medium strength range of exertion, but the maintenance occupation position requires a more frequent level of combined standing and walking.  (*Id.* at 2032–33.)

1
2
3
4
5
6
7

> appointments without relief. He underwent 2 facet injections (1/15/16 and 6/3/16) prior to going out of work without relief. He asked his PCP for paperwork 6/30/16 for disability the end of July 2016. There was no acute event around his LDW and no treatment changes. It is noted that there were issues with his new boss at work and that he was forced to retire. There was no recommendation for repeat imaging or referral to a specialist. There was discussion with his PCP about not being able to take any pain medications due to his mother's prescription drug addiction. The claimant was prescribed Nortriptyline 8/3/16 and reported stopping this after 2 weeks [due to] severe headaches — no other pain medication was recommended [for] trial.

8   (*Id.* at 2042.)  As to Plaintiff's reported behavioral health and cognitive issues, Nurse Tirabassi

9   noted that Plaintiff's office visit notes with Dr. Saqui do not document any such complaints nor

10   are any behavioral health or cognitive abnormalities reported on exam.  Also, none of his provider

11   exams in 2015 or 2016 leading up to when he stopped working (in July 2016) indicate any issues

12   with anxiety or depression and otherwise note normal mental status and cognitive exams.  Nurse

13   Tirabassi also noted that while Plaintiff started seeing various behavioral health providers and

14   started various classes after he stopped working, these "various group notes only document his

15   participation and focus of the class and do not document any mental status exams."  She further

16   noted that regardless, while participating in these classes, the contemporaneous office visit notes

17   from his PCP note normal mental status exams including normal mood, behavior, speech, dress,

18   motor activity, and thought process.  Nurse Tirabassi also added that no behavioral health

19   provider has given any R/Ls, and Dr. Saqui noted that his behavioral health R/Ls are "none."  (*Id.*

20   at 2037–44.)

21       3.    Physician consultant Dr. Scott B. Norris, Board Certified in Family and

22   Occupational Medicine, also reviewed the file information.  In a report dated January 24, 2018,

23   Dr. Norris opined that Plaintiff was not functionally precluded from performing his full-time

24   occupational duties from July 18, 2016 through the elimination period, and beyond.  (*Id.* at 2046–

25   49.)  Dr. Norris explained that Plaintiff's examination findings were not consistent with the

26   severe level of impairment as reported by Plaintiff or with a degree of functional compromise that

27   would preclude medium level work.  (For example, Dr. Norris noted that Plaintiff sustained a L1

28   fracture from his 2014 MVA.  However, recent exam findings describe normal alignment,

nonspecific mild lumbosacral tenderness w/palpation and ROM, no spasm or hypertonicity, near-normal range of motion, normal gait, negative nerve root tension signs, and no neurological deficits.)  Dr. Norris also noted that diagnostic testing/imaging did not identify structural disease or other pathologic conditions consistent with functional loss, and that Plaintiff's level and intensity of treatment remained stable without evidence of a significant acceleration or advancement that would be expected or consistent with refractory or progressive symptoms.  (*Id.*)

4.      Commenting on Plaintiff's reported behavioral health symptoms, Dr. Norris stated:

> .    .    .    Records describe a relatively low level of intervention/[treatment] for [behavioral health] conditions, consisting of a single visit in 2014, followed by resumption of intermittent ([] 3 months) therapy visits in Aug 2016. [Mental status examinations] remained unremarkable except for intermittent depressed and anxious mood.  The EE denied cognitive deficits (TPC, 1/4/17), and cognitive deficits were not described on examinations. Psychotropic medications were managed by the insured's PCP and remained of modest/stable intensity. The EE reported improved [symptoms] on Zoloft.[21]  He did not require evaluation or treatment by a psychiatrist.  He attended four PTSD group sessions beginning in 2017.  Contemporary records indicate that the EE did not require hospitalization, ongoing intensive outpatient therapy, or urgent/emergent treatment for acute psychiatric or emotional distress. Dr. Saqui (PCP) opined (APS, 11/17/16) [behavioral health] R/Ls as, "none." None of the insured's [attending physicians] opined R/Ls due to [behavioral health] conditions, and the file records do not otherwise support such R/Ls.

(*Id.* at 2048.)

5.      Unum Provides Copies of the Medical and Vocational Reports to Counsel and Reviews Additional Documentation Submitted on Appeal: As requested by Plaintiff's counsel, Unum sent counsel copies of the reports of the medical and vocational reviews conducted during the appeal review — to allow counsel an opportunity "to review and respond" to the reports — before Unum would complete its review and make an appeal decision.  (*Id.* at 2051–52.)

6.      Plaintiff Submits Report of a Functional Capacity Evaluation ("FCE"): Thereafter, Plaintiff's counsel submitted a report of a FCE (performed on March 20, 2018) as well as a

---

[21]      Dr. Norris added that "[f]ile records do not support ongoing R/Ls related to adverse medication effects and/or side effects."  Dr. Norris explained that Plaintiff's medications included Zoloft and Ibuprofen, and that "[e]xaminations did not describe sedation, somnolence, or psychomotor agitation/retardation related to medications."  (*Id.* at 2048.)

March 27, 2018 report of a vocational assessment (by consultants retained by Plaintiff's counsel). (*Id.* at 2081–2100.)  DPT Sebastian Jurado, who performed the FCE, concluded the following: "Based on the test results, the client gave maximum effort with testing.  Test results indicate that the client had a 100% consistency with coefficient of variance measurements below 15%.  Intra-test and inter-test reliability is evident for this test.  The client's heart rate increased after functional activities consistent with performing maximal efforts." (*Id.* at 2082.)  The tests given by Mr. Jurado include sensory loss (*id.* at 2088), range of motion (*id.* at 2090), grip strength (*id.* at 2092), static strength, and isometric strength (*id.* at 2096).  Based on his testing, Mr. Jurado concluded Plaintiff was limited to three hours a day sitting, one hour a day standing or walking, no limitation in his ability to grasp or finger (except a 24-repetition limit on overhead reaching), with no squatting and infrequent bending. (*Id.* at 2081–83.)  He stated that Plaintiff's "lumbar spine range of motion is limited in all planes with painful end ranges of motion," that he had decreased strength in his bilateral hip flexors, and that "sensation to light touch/pressure is impaired along the client's right upper arm as well as his hands." (*Id.* at 2082.)  He concluded Plaintiff "is unable to safely return to work at any occupational level including a sedentary occupation." (*Id.* at 2081.)

       7.    <u>Plaintiff's Vocational Consultant</u>: Joseph Atkinson stated that, based on the FCE and Plaintiff's occupation, he was disabled from that occupation:

> [Plaintiff] has an extensive history of back pain following an automobile accident in 2014 in which he suffered a burst fracture. He has been advised he is not a surgery candidate and he has tried extensive conservative treatment.  He was able to work for two years following the accident.  However, the record indicates his supervisor accommodated his limited work capacity.  Over time, his condition worsened and there was a change of supervisor at his job, ending his period of accommodation and forcing him out of work.

(*Id.* at 2105.)  Mr. Atkinson concluded that "[e]very opinion of work capacity would preclude [Plaintiff] from performing his occupation as it is performed in the national economy, which is the stated criteria per Unum . . . ." (*Id.* at 2105.)

///

8.      Additional Reviews: Following receipt of the additional documentation, Unum obtained another medical review from Dr. Scott Norris to determine whether the new records changed his prior opinion.  In an addendum report dated April 20, 2018, Dr. Norris opined that the additional records did not change his prior opinion.  (*Id.* at 2176–79.)  Dr. Norris explained that the "[e]xamination findings during the FCE were not c/w [consistent with] the far more time-relevant findings of the insured's own providers and the IME," that the FCE was completed over 14 months after the end of the elimination period, and that "the opinion of the IME (May 2017) regarding R/Ls was more time-relevant regarding the EE's clinical and functional status during the EP than the FCE, which was accomplished over one year after the end of the EP."  Dr. Norris concluded:

> The additional records received, including pain logs from Dec 2017 through Mar 2018 and the Mar 2018 FCE, did not provide reasonable time-relevant information regarding the insured's clinical and functional status as of the DOD (7/18/16) through the end of the EP (1/14/17). The additional records did not provide clinical or functional information that would refute the opinion of the IME performed on 5/26/17 by Dr. Bernhard (PMR). As stated in my prior review, records do not describe a significant change in the EE's physical or psychiatric clinical status as of Jul 2016 through the EP.

(*Id.* at 2177.)

9.      Ms. Marsiano also reviewed the report of the vocational assessment performed by Joseph Atkinson to determine if it changed the conclusions reached in her January 8, 2018 review.  Ms. Marsiano opined: "The information provided by Mr. Atkinson does not alter the appeals vocational file review dated 4/12/18.  Physical demands of Maintenance Electrician and Maintenance Mechanic are very similar as described and, based on Unum Life's medical review of 4/20/18, there are no supported R/Ls that would exceed the demands of either of the occupations."  (*Id.* at 2208–10.)

### J.      Unum Upholds Denial of Plaintiff's Claim on Appeal

1.      On April 30, 2018, Unum notified Plaintiff that it was upholding its claim decision on appeal on the grounds that Plaintiff's reported physical and mental health symptoms did not preclude him from performing his regular occupation as of July 18, 2016, and throughout the 180-

1  day Elimination Period.  Unum Life explained that the medical and vocational evidence did not

2  support disability under the Policy.  (*Id.* at 2213–24.)

3  **II.      CONCLUSIONS OF LAW**

4  A.      Legal Standard

5  1.      Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . the

6  court must find the facts specially and state its conclusions of law separately.  The findings and

7  conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of

8  decision filed by the court.  Judgment must be entered under Rule 58."

9  2.      This Court has jurisdiction over Plaintiff's claims pursuant to ERISA.  *Clorox Co.*

10  *v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521 (9th Cir. 1985) ("ERISA creates a

11  federal cause of action, with concurrent state and federal jurisdiction, over claims by an employee

12  'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of

13  the plan, or to clarify his rights to future benefits under the terms of the plan.'" (quoting 29 U.S.C.

14  § 1132(a)(1)).

15  3.      "ERISA represents a careful balancing between ensuring fair and prompt

16  enforcement of rights under a plan and the encouragement of the creation of such

17  plans."  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal citations and quotation marks

18  omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they

19  had earned, but Congress did not require employers to establish benefit plans in the first

20  place."  *Id.* at 516–17 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

21  4.      The parties agree that the long-term disability plan at issue in this case is an

22  "employee welfare benefit plan" subject to ERISA.  *See* 29 U.S.C. § 1002(1) (defining "employee

23  welfare benefit plan" and "welfare plan" to include "any plan, fund, or program . . . established or

24  maintained by an employer or by an employee organization, or by both, to the extent that such

25  plan, fund, or program was established or is maintained for the purpose of providing for its

26  participants or their beneficiaries, through the purchase of insurance or otherwise[ ] . . . benefits

27  in the event of sickness, accident, disability, death or unemployment.").

28  ///

5.     "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "[F]or a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Abatie*, 458 F.3d at 963 (italics added).

6.     Because the parties have not pointed to a provision in the policy vesting the administrator with discretionary authority, the Court finds *de novo* review to be the applicable standard of review in the instant case.

7.     *De novo* review "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Kollar v. Sun Life Assurance Co. of Canada*, No. C20-5278-JCC, 2021 WL 2949801, at *2 (W.D. Wash. July 14, 2021) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)).  "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010) (italics added); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (explaining that in a trial on the administrative record, "[the] district judge will be asking . . . as he reads the evidence, . . . whether [the plaintiff] is disabled within the terms of the policy" and may "evaluate the persuasiveness of conflicting testimony and decide which is more likely true").

8.     This Court therefore does not examine whether Unum's actions were reasonable.  *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir. 2009), (holding that, under abuse of discretion standard, the plan administrator's decision can be upheld if it is "grounded on any reasonable basis." (internal citation omitted)); *see also Conkright*, 559 U.S. at 521 ("Applying a deferential standard of review . . . means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" (quoting *Firestone*, 489 U.S. at 111)).  Rather, the Court will examine the facts in the first

1    instance to determine whether Plaintiff is disabled.

2        9.    In an ERISA action, the plaintiff carries the burden of showing, by a

3    preponderance of the evidence, that he or she was disabled under the terms of the Plan during the

4    claim period. *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. Jan. 5, 2011).

5        B.    Analysis

6        1.    Plaintiff's singular claim is for the recovery of benefits under the Policy pursuant

7    to ERISA § 502(a)(1)(B).  (*See* ECF No. 1.)  Accordingly, the sole issue in the instant cross-

8    motions for judgment is whether Plaintiff was disabled from performing the material and

9    substantial duties of his regular occupation due to his sickness or injury during the Elimination

10    Period and beyond.  Unum contends Plaintiff's Elimination Period covered from July 18, 2016

11    through January 13, 2017 (ECF No. 29 at 23), and Plaintiff does not refute this assertion.

12    Therefore, the Court must determine whether Plaintiff was unable to perform the material and

13    substantial duties of his regular occupation from July 18, 2016 through January 13, 2017.  The

14    Court finds the preponderance of the evidence supports the conclusion that Plaintiff was disabled

15    from his regular occupation during the Elimination Period.

16        2.    Medical records demonstrate the deterioration of Plaintiff's physical health and

17    abilities through the Elimination Period and thereafter.  Plaintiff's primary treating physician

18    concluded Plaintiff could not lift the 50 pounds required for his occupation (limiting him to 20

19    pounds), could not stand or walk up to 2/3 of the workday, and was not capable of the occasional

20    climbing, stooping, kneeling, crouching, and/or crawling.  Unum's examiner also concluded

21    Plaintiff could occasionally lift 50 pounds, walk up to five hours per day with breaks every 40

22    minutes, and limited Plaintiff's reaching and climbing for one hour per day and stooping for one-

23    half hour per day.  Although Unum's examiner later modified these R/Ls, he failed to provide an

24    adequate explanation for doing so.  Accordingly, these restrictions ensured Plaintiff could not

25    perform his duties as a Maintenance Electrician, the physical demands of which have been

26    identified by Unum as involving: "occasional exertion up to 50 pounds, standing, walking, sitting,

27    keyboarding, reaching, reaching up/down, climbing, stooping, kneeling, crouching, and crawling;

28    frequent handling, fingering; and that standing/walking could occur up to 2/3 of the workday."

1   (ECF No. 29 at 15 (citing AR 841–42).)

2          3.   **Plaintiff's back pain**: The record reflects Plaintiff sustained a fracture in his L1

3   vertebrae after a MVA in February 2014.  His condition persisted despite physical therapy,

4   acupuncture, and spinal injections.  As a result, Plaintiff stopped work because of his pain after

5   July 18, 2016.  During the Elimination Period, Plaintiff was examined by a doctor hired by Unum

6   to complete an IME, his own primary treating physician, and a physical therapist who completed

7   an FCE.  The objective tests and observations of these doctors confirmed Plaintiff's diagnosis of

8   chronic low back pain.  Plaintiff's medical records support a finding, by a preponderance of the

9   evidence, that he was disabled continuously throughout the Elimination Period due to his back

10  pain.

11         4.   **Weight afforded various doctors**: Treating physicians are not accorded any

12  special deference in ERISA cases, but the Court may still evaluate the relative weight of

13  reviewing physicians based on their opportunity to evaluate a plaintiff.  *Salomaa v. Honda Long*

14  *Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (determining that medical opinions

15  rendered after in-person examination are more persuasive than contrary opinions following paper-

16  only reviews of records); *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 942 (N.D. Cal.

17  2019) ("While deference is not necessarily owed to treating physicians in ERISA cases,

18  conclusions drawn at the end of in-person medical examinations are inherently more helpful

19  because the treating physician observes and interacts with the patient for several minutes at a

20  time").  "A treating physician's opinion may merit less weight where, for example, the

21  relationship between the claimant and the physician has been of short duration or where a non-

22  treating specialist has pertinent expertise that the treating physician lacks."  *Filarsky*, 391 F.

23  Supp. 3d at 939 (internal quotation marks omitted).  The weight given to an examining doctor's

24  conclusions and diagnosis is based upon: "(i) the extent of the patient's treatment history; (ii)

25  whether the examining physician specializes in the condition at issue; and (iii) how much detail

26  the examining physician provides to support his conclusions."  *Id.* at 940.

27  ///

28  ///

5.   Plaintiff's primary treating physician, Dr. Minerva Saqui: Dr. Saqui has a long history of treating Plaintiff for his spine-related health conditions since they first arose after the MVA.  Plaintiff notes that he first saw her with respect to his back pain on July 22, 2015.  (AR 1527.)  Since then, Plaintiff has seen Dr. Saqui repeatedly for referrals to spine specialists and pain management assistance.  (*Id.* at 56, 63, 495, 519, 577–91, 1551, 1625.)  Plaintiff's claim for STD benefits, submitted on July 20, 2016, was also supported by a July 15, 2016 note from Dr. Saqui.  (*Id.* at 51, 55, 495.)  Dr. Saqui's note stated the following:

> Chronic axial back pain, lower back, daily, stabbing, intensity varies from 3 to 6, worse sitting for an hour, rolling in bed, lifting heavy objects, bending or raking yardwork . . . no relief with NSAIDs, cannot take stronger pain medications due to work duties . . . modalities done: [physical therapy] — doing [home exercise program]; acupuncture and facet injections — not effective.

(*Id.* at 495.)

6.   Within the Elimination Period specifically, on November 17, 2016, Dr. Saqui stated in an APS (that was used to support Plaintiff's LTD claim) that his primary diagnosis was "chronic low back pain" and his secondary diagnosis was "post[-]traumatic stress disorder."  (AR 52.)  Under the R/Ls section, she noted: "sitting > 2 hrs, standing > 30 minutes, lifting > 30 lbs, frequent bending, no climbing ladders or tower."  (*Id.* at 53.)  The duration of these R/Ls was noted from July 18, 2016 to January 21, 2017."  (*Id.*)  Dr. Saqui also responded to a letter from an Unum physician, Dr. Trent, as detailed below.  Even though Dr. Saqui is not a qualified disability examiner, because she treated Plaintiff for a significant length of time, the Court finds that her opinions are entitled to some weight.

7.   Unum physician, Dr. Thomas Trent: On March 13, 2017, Dr. Trent, after a review of the materials submitted with Plaintiff's claim, wrote to Dr. Saqui with a list of questions regarding Plaintiff's "functional capacity to perform full-time, medium-level activity from 7/18/2016 to ongoing."  (*Id.* at 858–61.)  On March 15, 2017, Dr. Saqui responded and disagreed that Plaintiff could lift the 50 pounds required by his occupation, limiting him to 20 pounds.  (*Id.* at 864.)  She also disagreed that he could stand or walk "up to 2/3 of the workday."  (*Id.*)  Although she made a disclaimer stating that she is "not a qualified disability medical examiner

and did not do [a] physical exam to determine functional capacity," she did say her findings as to

his incapacity to work is "based on reported symptoms, physical exam [of the] tender lumbar

spine, [and] failed treatment modalities for chronic pain." (*Id.*)  Dr. Saqui estimated his R/Ls are

"indefinite" and recommended for him to "be examined by [a] qualified disability medical

examiner . . . ." (*Id.*)

        8.   <u>Unum's hired independent medical examiner, Dr. Mark Bernhard</u>: In light of Dr.

Saqui's comments, Unum hired a physician to complete an IME.  Dr. Mark Bernhard completed

the exam on May 26, 2017, and concluded:

> Based on the findings of the review of records, physical examination performed by me, history, and progression in terms of improvement, ability to engage in unrestricted work full-time from late 2014 to July 2016 with a minimal degree of chronic pain, the claimant was stable and improved level from the L1 vertebral body fracture.  The majority of the medical records focused on PTSD as a condition that received the most attention in terms of psychotherapy, support, and subjective complaints given that the claimant had flashbacks and nightmares due to the fact that the party who struck him died in the [MVA].

(*Id.* at 1345.)  Dr. Bernhard also concluded the following: "[t]he claimant is capable of lifting 50

pounds on an occasional basis from floor to waist level"; "[t]here are no restrictions in terms of

fingering or handling any activities"; "[t]he claimant would be able to stand or walk up to 5 hours

per day cumulatively with breaks approximately every 40 minutes"; and "[t]he examinee is

capable of sitting on an occasional basis, engaging in keyboard use, reaching, reaching upward

and downward, climbing on occasional basis, that is up to 1 hour per day; stooping cumulatively

for one-half hour per day; kneeling on an occasional basis; crouching on an occasional basis; and

crawling on an occasional basis." (*Id.*)  Dr. Bernhard noted that the R/Ls "are based on findings

at the time of examination indicating satisfactory muscle strength, satisfactory range of motion,

and stable compression fracture without the need for ongoing treatment or surgery." (*Id.*)

        9.   On June 14, 2017, Unum wrote to Dr. Bernhard in search of additional

information. (*Id.* at 1375.)  Unum stated that in its previous communication to Dr. Bernhard, he

was "not provided with specific definitions regarding the performance of occupational duties on

an 'occasional' and/or 'frequent' basis, as well as context regarding specific dates pertinent in

consideration of [Plaintiff's] [LTD] claim." (*Id.*)  Unum asked whether Plaintiff could "work

full-time from 7/18/2016 onward within the [R/Ls] [Dr. Bernhard] outlined per 5/26/2017 IME

report, in context of the specific functional demand required of his occupation as defined below":

- Occasional exertion up to 50 pounds.
- Frequent handling and/or fingering.
- Standing/walking can occur up to 2/3 of the workday.
- Occasional sitting, keyboard use, reaching, reaching upward/downward, climbing, stooping, kneeling, crouching, and/or crawling.

(*Id.* at 1376.)

10.  Dr. Bernhard signed and returned the form and checked the box "yes" as to

whether Plaintiff could work full-time with the foregoing conditions.  (*Id.* at 1384–85.)  Although

Plaintiff contends that Dr. Bernhard "changed [Plaintiff's] reaching and climbing ability from 1

hour in an 8 hour day to 2.6 hours" and "changed [Plaintiff's] stooping restriction from one-half

hour per day to 2.6 hours" without any explanation for the change, the Court finds that Dr.

Bernhard's response to Unum's form is consistent with the findings in his IME.  Unum noted

that, "per [its] vocational consultants, the term 'occasional' indicates an activity or condition

exists up to 1/3 of the time (0–2.5 hours per day), and the term 'frequently' indicates an activity

or condition exists from 1/3–2/3 of the time (2.5–5.5 hours per day in an 8-hour workday)."  (*Id.*

at 1376.)  Plaintiff's abilities of one hour for reaching and climbing and one-half hour for

stooping fall within Unum's definition of "occasional" and Dr. Bernhard also previously

identified them as "occasional."  Accordingly, Dr. Bernhard's recommendation did not change.

11.  With respect to the overbilling practice of Dr. Bernhard as noted previously,

Plaintiff argues Dr. Bernhard's "fraudulent conduct not only shows [his] lack of credibility, but

demonstrates the assembly-line nature of his practice."  (ECF No. 28 at 16.)  Plaintiff states Dr.

Bernhard saw six injured workers for medical-legal evaluations at 30 minute intervals between 2

p.m. and 4:30 p.m., but billed 3.75 hours for the 2.5 hours.  (*Id.* (citing AR 2278).)  Plaintiff

contends that "[t]hese evaluations were critically important for each injured worker, yet Dr.

Bernhard lined them up like widgets on a factory conveyor belt to maximize his income."  (*Id.*)

1    Plaintiff notes "Dr. Bernhard did not contest the allegations against him, but agreed to a

2    resolution that required paying restitution to the over billed insurers." (*Id.* (citing AR 2281).)

3    Plaintiff also maintains Dr. Bernhard's evaluation of him was cursory with "some standard

4    neurological and range of motion tests." (*Id.* (citing AR 1337–38).)

5          12.   The Court finds Dr. Bernhard's prior alleged conduct, if true, troubling.  However,

6    the Court gives Dr. Bernhard's conclusions some weight as Dr. Bernhard was able to conduct an

7    in-person examination of Plaintiff, is a qualified medical evaluator, and specializes in physical

8    medicine and rehabilitation. (*Id.* at 1331–46.)  In his "review of systems," Dr. Bernhard noted

9    that with respect to his musculoskeletal system, Plaintiff is "[p]ositive for joint pain, leg pain, and

10   weakness," and with respect to his neurologic system, Plaintiff is "[p]ositive for numbness,

11   tingling, problems with memory, speech problems, and inability to concentrate." (*Id.* at 1335.)

12   After Dr. Bernhard's lumbosacral spine examination, he noted that "[t]here is mild tenderness at

13   the lumbosacral joint bilaterally." (*Id.* at 1337.)  The Court also notes that some of Dr.

14   Bernhard's tests with respect to Plaintiff's range of motion deviates from "normal."  Specifically,

15   with "lateral bending – left," normal is 25 degrees and Plaintiff is 22 degrees. (*Id.*)  With "lateral

16   bending – right," normal is 25 degrees and Plaintiff is at 20 degrees. (*Id.*)  With respect to his

17   review of Plaintiff's medical records, he notes that the records were "perceived and reviewed by

18   me" and a "summary was conducted." (*Id.* at 1338.)

19         13.   The Court further finds Plaintiff is correct that Dr. Bernhard did not write in his

20   summary that he reviewed Plaintiff's treatment records with his doctors from the time of his

21   injury in February 2014, his return to work in September 2014, his increase in symptoms in July

22   2015, and his attempts to find an effective treatment — progress notes or doctors' notes are only

23   listed starting March 31, 2016. (ECF No. 28 at 16 (citing AR 1331–46).)  The Court finds Dr.

24   Bernhard did not have all of the information to adequately conclude Plaintiff had been able to

25   work "unrestricted" at his job from late 2014 to July 2016 "with a minimal degree of chronic

26   pain" and that Plaintiff's condition was "stable and improved." (AR 1345.)  Accordingly, the

27   Court finds his opinions are entitled to a little weight.

28   ///

14.  <u>Unum's in-house physician, Dr. Scott Norris</u>: After Unum denied the claim and

Plaintiff appealed, Plaintiff submitted additional medical records which Unum had not seen

before.  (AR 1511–1892.)  The records went back to July 20, 2015 (*id.* at 1516) and reflect

Plaintiff's increasing physical symptoms and attempts to obtain treatment (*id.* at 1545–56, 1607,

1625, 1631).  On appeal, Unum had Dr. Norris review the record.  (*Id.* at 2046.)  Dr. Norris

concluded the following: "With a reasonable degree of medical certainty, I find that the medical

evidence does not support R/Ls that would have precluded [Plaintiff] from performing sustained

full time medium level activity . . . from 7/18/16 through the 180-day [Elimination Period] ending

1/14/17, and beyond." (*Id.* at 2046.)  Dr. Norris also stated the following:

> The level and intensity of treatment remained stable and modest
> without evidence of a significant acceleration or advancement that
> would be expected or consistent with refractory or progressive
> [symptoms].  The level of treatment was not [consistent with] the
> severe level of impairment as reported by the [patient], or with a
> degree of functional compromise that would preclude medium level
> activity . . .
>
> •  Lumbar facet injections were performed in Jan and June 2016
>    [without] reported improvement.  The [patient] reported that
>    acupuncture, [a home exercise program], and [physical
>    therapy] did not significantly improve his [symptoms];
>    however, the [patient] continued to work between 2014 and
>    2016.  The [patient] and his [primary care physician]
>    discussed going on disability.  The [patient] stated that he was
>    concerned that pain medications would prevent him from
>    working.  After going [out of work?] narcotic pain
>    medication was not prescribed.  The [patient] was advised to
>    take NSAIDs, a relatively low-intensity intervention.  He
>    attended a chronic pain group class.  Overall, the intensity of
>    therapy as described in contemporary clinical records
>    remained low.
>
> •  The [patient] was not a surgical candidate.

(*Id.* at 2048.)  The Court also notes that Dr. Norris never physically examined Plaintiff and has a

Board Certification in "Family/Occupational/Aerospace Medicine."  (*Id.* at 2049.)  Neither party

provided information about how long Dr. Norris has been reviewing medical records in claims for

LTD benefits or how long he has been practicing as a doctor.  Accordingly, the Court finds that

Dr. Norris' evaluation is entitled to little weight.  *See Delaney v. Prudential Ins. Co. of Am.*, 68 F.

Supp. 3d 1214, 1229 (D. Or. 2014) (finding ERISA claims administrator was not free to refuse to

26

credit beneficiary's reliable evidence, including opinions of her treating doctors, when denying

her claim for LTD benefits, even though it was not required to give the treating doctor's opinion

special weight); *see also Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp.

3d 1237, 1255 (N.D. Cal. 2014) ("when an in-person medical examination credibly contradicts a

paper-only review conducted by a professional who has never examined the claimant, the in-

person review may render more credible conclusions").

15.   Plaintiff's hired functional capacities evaluator, DPT Sebastian Jurado: On March

20, 2018, Mr. Jurado completed an FCE that was added to Plaintiff's file.  (*Id.* at 2081–2100.)

Plaintiff contends that unlike Dr. Bernhard's conclusions, Mr. Jurado provides further objective

data to test Plaintiff's work capacity.  (ECF No. 28 at 19.)  The Court agrees.  Mr. Jurado lists the

name of every objective test completed for every R/L evaluated.  For example, Mr. Jurado used

the "Tracker ROM from JTECH Medical" to evaluate spine range of motion (*id.* at 2090), "the

JTECH computerized static strength evaluation system and standard lift evaluation protocols

outlined by [the National Institute for Occupational Safety and Health ("NIOSH")]" for lifting

capacity and static strength testing (*id.* at 2084, 2095), and the Minnesota Dexterity Test for

reaching overhead/forward/down and dexterity (*id.* at 2084, 2099).  With respect to R/Ls, Mr.

Jurado stated as follows:

> Work activities and postures were assessed during functional
> activities and structured sequences.  The client demonstrated the
> ability to sit for 15 minutes until he had to stand up due to pain in his
> low back.  While sitting, he intermittently adjusted his posture.  He
> was able to stand for 10 minutes while leaning against the wall until
> he had to sit due to low back pain.  He ambulated with a stiff trunk
> and reported increased low back pain the longer he ambulated.
> Moreover, it was unsafe for the client to bend at the waist repetitively
> due to low back pain and poor mobility.  He was unable to safely
> squat with proper biomechanics without holding onto the furniture.
> The client was able to climb/descend 5 flights of stairs using the
> railing until he was limited due to low back pain.  Based on the test
> results, the client should tolerate sitting, standing and walking on an
> "occasional" basis, limiting sitting to 15 minutes continuously and
> up to 3 hours a day, and standing and walking to 10 minutes
> continuously and up to 1 hour a day each.  Bending should be
> tolerated on an "infrequent" basis.  The client should "never" squat.
> Stair climbing should be tolerated on an "occasional" basis.  The
> client's balance is satisfactory as tested on even surfaces.

(*Id.* at 2083.)  Mr. Jurado summarized his evaluation as follows:

1
2
3
4

> The information in the medical records provided is consistent with the client's report of his history and symptoms.  Based on the client's physical limitations evidenced throughout the FCE, the client is unable to return to work at any occupational level, including a sedentary occupation.  He presented with poor postural tolerance in sitting, standing, and walking, and poor overall mobility as a result of low back pain.

5   (*Id.* at 2082.)  Unum notes that these findings "rely[] mostly on Plaintiff's self report" and are "in

6   stark contrast to the multiple office visit notes of Plaintiff's treating providers whose exams

7   consistently noted 5/5 motor strength on bilateral extremities, intact sensation, intact and

8   symmetrical reflexes, negative SLR, and satisfactory lumbar range of motion."  (ECF No. 29 at

9   20.)

10       16.  However, Plaintiff maintains — and the Court agrees — that Mr. Jurado's opinion

11   is consistent with Dr. Saqui's opinion of Plaintiff during the Elimination Period.  The Court notes

12   that this is true despite the FCE being completed more than 14 months after the end of the

13   Elimination Period.  This gives Mr. Jurado's evaluation further support.  Namely, Dr. Saqui

14   limited Plaintiff to sitting for no more than two hours, standing for no more than 30 minutes, and

15   lifting no more than 30 pounds."  (*Id.* at 53.)  Dr. Saqui stated Plaintiff can do "frequent bending,"

16   but no "climbing ladders on tower."  (*Id.*)  She further agreed with Dr. Trent that Plaintiff could

17   do "occasional sitting, keyboard use, reaching, reaching upward/downward," but not "climbing,

18   stooping, crouching, or crawling."  (*Id.* at 864.)  Accordingly, the Court finds that Mr. Jurado's

19   FCE is entitled to some weight.

20       17.  With this FCE and the review completed by Plaintiff's retained vocational

21   consultant, Mr. Atkinson, Unum obtained another review from Dr. Norris to ascertain whether the

22   new information changed his previous determination.  Dr. Norris, in an addendum dated April 20,

23   2018, stated as follows:

24
25
26
27
28

> The additional records received, including pain logs from Dec 2017 through Mar 2018 and the Mar 2018 FCE, did not provide reasonable time-relevant information regarding the insured's clinical and functional status as of the [date of disability] (7/18/16) through the end of the [Elimination Period] (1/14/17).  The additional records did not provide clinical or functional information that would refute the opinion of the IME performed on 5/26/17 by Dr. Bernhard (PMR).  As stated in my prior review, records do not describe a significant change in the [patient's] physical or psychiatric clinical status as of

28

1    Jul 2016 through the [Elimination Period].

2    (*Id.*)  Dr. Norris also noted that because Plaintiff reported an 8 out of 10 pain at the outset of the

3    FCE testing, "FCE activities would not generally be initiated or continued" at that level, but

4    Plaintiff continued to participate "and his performance was not [consistent with] an ongoing 8/10

5    pain." (*Id.* at 2178.)  Dr. Norris also states that the credentials of the evaluator were not specified.

6    (*Id.*)  While the Court agrees with the issue about the credentials of Mr. Jurado, Dr. Norris does

7    not provide further explanation as to why FCE activities could not be conducted at Plaintiff's pain

8    level and why they would not be an accurate reflection of his R/Ls.  However, because the FCE is

9    consistent with Dr. Saqui's findings during the Elimination Period, the Court finds that it is

10   entitled to a little weight.

11   18.  **Weight of subjective reports of pain**: It would be an abuse of discretion for the

12   Court to fail to consider Plaintiff's subjective account of pain.  *Kibel v. Aetna Life Ins. Co.*, 725 F.

13   App'x 475, 477 (9th Cir. 2018) (citing *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th

14   Cir. 2016)).  During the Elimination Period, Dr. Bernhard noted Plaintiff's self-reports of the

15   severity of his pain as follows: "On a scale of 0 to 10, with 0 being no pain and 10 being severe

16   pain, he rated his pain at the moment as a 5.  At its worst, his pain is rated as a 6, and on average

17   it is 4.  With activity, his pain level increases to 6.  In terms of frequency, on a scale of 0 to 10

18   with 0 being rarely and 10 being all the time, he rates his pain as an 8." (*Id.* at 1335.)  The Court

19   has also taken into consideration Plaintiff's own reports on his functional activity limitations or

20   interference as summarized by Dr. Bernhard.  (*Id.* at 1336.)  Of note, Plaintiff rated 3 out of 10 in

21   terms of preventing him from lifting 10 pounds, a 5 out of 10 in terms of interference with his

22   ability to sit and stand for half an hour, a 9 in terms of interference with his ability to get enough

23   sleep, a 8 out of 10 in terms of interference with his ability to participate in social activities, and a

24   5 out of 10 in terms of his ability to travel up to one hour by car.  (*Id.*)  Thus, the Court finds that

25   Plaintiff's reports of pain are entitled to some weight.

26   19.  The Court acknowledges the difficult task of administrators who must weigh

27   evidence as they receive it and determine the credibility of disability claimants.  Despite this

28   difficulty for administrators, the Court finds Plaintiff to be a credible witness.  Plaintiff worked

29

for years with back pain and only ceased working after multiple attempts at pain management (namely, spinal injections and acupuncture) failed and his pain continued.  On balance, the Court finds Plaintiff adequately establishes by a preponderance of the evidence that he was disabled from his regular occupation during the Elimination Period.

20.  **Remand**: Unum requests that "[i]f the Court determines Plaintiff was disabled under the Policy[] . . . no benefits should be awarded past January 14, 2019 and the matter should be remanded to Unum to determine whether Plaintiff is disabled under the Policy's Any Gainful Occupation definition of disability."  (ECF No. 29 at 25–26.)  Plaintiff did not make any specific argument in his briefs as to why he is entitled to benefits past the initial 24-month period. Further, Ninth Circuit authority is clear on this matter.  *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) (finding that because the defendant never had an opportunity to decide the plaintiff's case under the "any occupation" standard, the district court erred in granting benefits past the initial 24-month period based on the "own occupation" standard); *see also Hantakas v. Metro. Life Ins. Co.*, 2:14-cv-00235-TLN-KJN, 2016 WL 374562, at *7 (E.D. Cal. Feb. 1, 2016) (same); *Monroe v. Metro. Life Ins. Co.*, No. 2:15-cv-020279-TLN-CKD, 2020 WL 1430005, at *27 (E.D. Cal. Mar. 24, 2020) (same).  Because the administrator has not had the opportunity to consider whether Plaintiff is disabled under its definition for any gainful occupation, the Court agrees remand is appropriate. Accordingly, the remainder of Plaintiff's claim is REMANDED for Unum to determine whether Plaintiff can perform the material duties of any gainful occupation.

### III.   CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff was disabled within the meaning of the Policy as of the beginning of the Elimination Period, July 18, 2016, and was entitled to long-term disability benefits for the initial 24-month period.  Unum must now determine whether Plaintiff is entitled to benefits under the "any gainful occupation" standard.  This case is REMANDED for the limited purposes of enabling Unum to make that determination.

///

///

30

IT IS SO ORDERED.

DATE:  February 15, 2022

Troy L. Nunley
United States District Judge